**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

FILED

2013 MAR 22  PM 3: 38

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
AKRON

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff, *ex rel.* | )<br>)<br>) |
| | ) |
| [SEALED],<br>Plaintiff-Relator, | )<br>)<br>) |
| | ) |
| v. | )<br>) |
| [SEALED] | )<br>) |
| Defendants. | )<br>)<br>) |

CASE NO. 5 : 13    CV    632

JUDGE

# JUDGE ADAMS

**FILED UNDER SEAL**
**PURSUANT TO**
**31 U.S.C. § 3730(b)(2)**

# MAG. JUDGE BURKE

Jury Demand Endorsed

## COMPLAINT AND JURY DEMAND

Ann Lugbill (0023632)
Trial Attorney for Relator
Murphy Anderson PLLC
2406 Auburn Avenue
Cincinnati, OH 45219
Phone: (513) 784-1280
Fax: (877) 784-1449
*alugbill@murphypllc.com*

Mark Hanna
Lorrie Bradley
Murphy Anderson PLLC
1701 K Street NW, Suite 210
Washington, DC 20006
Phone: (202) 223-2620
Fax: (202) 223-8651
*mhanna@murphypllc.com*
*lbradley@murphypllc.com*

Nancy Holland Myers (0037964)
697 West Market Street
Akron, Ohio 44302
Phone: (330) 414-1822
*hmmlawnhm@neo.rr.com*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO** 2013 MAR 22 PM 3: 38
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, *ex rel.* | ) <br> ) <br> ) |
| WANDA L. RIEMAN,<br>Plaintiff-Relator, | ) <br> ) <br> ) |
| v. | ) <br> ) |
| CHILDREN'S HOSPITAL MEDICAL<br>CENTER OF AKRON, dba<br>AKRON CHILDREN'S HOSPITAL, | ) <br> ) <br> ) <br> ) |
| and | ) <br> ) |
| LISA STANFORD, PhD,<br>Defendants. | ) <br> ) <br> ) |

CASE NO. _____

5 : 13 CV 632

JUDGE  **JUDGE ADAMS**

**FILED UNDER SEAL**
**PURSUANT TO**
**31 U.S.C. § 3730(b)(2)**

Jury Demand Endorsed **MAG. JUDGE BURKE**

### COMPLAINT AND JURY DEMAND

1.      *Qui tam* Relator Dr. Wanda Rieman brings this action in the name of the United States Government for false claims involving Children's Hospital Medical Center of Akron, doing business under the registered trade name of Akron Children's Hospital, and Pediatric Neuropsychologist Lisa Stanford, PhD., who directs the Akron Children's Hospital's NeuroDevelopmental Science Center (NDSC).

2.      As a licensed clinical psychologist working in the Akron Children's Hospital's Neurobehavioral Health Division as a Pediatric Neuropsychologist, Relator Dr. Rieman witnessed Defendant Dr. Lisa Stanford falsely billing for non-existent services and overbilling as to the amount of time spent on services that were provided. Most seriously, Dr. Stanford required that inaccurate diagnoses for children be coded and, therefore billed, so that the Hospital would receive payment for neuropsychological pediatric evaluations that were otherwise not

compensable by Medicaid and other payors if the correct and less serious diagnoses were recorded on billing documents. Relator witnessed services being billed, under Dr. Stanford's direction, as if psychologists had performed them, when in fact the services were conducted by technicians, whose services were compensated at a much lower hourly rate, if they were compensable at all.

3.     Defendants Akron Children's Hospital and Lisa Stanford, PhD (hereinafter "Defendants") submitted or caused to be submitted to the United States Government and the state of Ohio fraudulent billings for services not provided, "upcoded" or falsely stated the level of service provided, or falsified the medical necessity of services provided. For at least six months, from November 2011 to May 2012, Akron Children's Hospital's NeuroDevelopmental Science Center failed to fulfill Ohio licensure requirements regarding supervision of unlicensed psychology students.  As a result, Defendants billed and caused to be billed services in violation of Medicaid and Medicare requirements.

4.     Relator brings this action on behalf of herself and the United States of America for violations of the United States False Claims Act, pursuant to the Federal False Claims Act *qui tam* provisions, 31 U.S.C. § 3729 *et seq*., to recover treble damages and civil penalties arising from false or fraudulent claims for reimbursements for medical treatment that were submitted or caused to be submitted by Defendants to the federal and Ohio state governments in violation of the False Claims Act. The False Claims Act specifically proscribes Defendants' conduct involving fraudulent billing and, thus, the submission of false or non-reimbursable claims to Medicaid and other government-funded health programs.

2

5. Defendants' False Claims Act violations and their various fraudulent billing schemes unlawfully increased costs to the United States for medical services. Defendants knew or should have known that their unlawful activities constituted filing false claims for reimbursement from the Federal Government in violation of the False Claims Act and involved violations of Title XVIII and Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, Medicare and Medicaid regulations, and similar State laws.

6. Defendants' scheme illegally charged government health programs and insurance plans for medical treatment that was not provided at all or not provided under required guidelines and overcharged government health programs and plans for covered treatment. The Federal and State government consequently paid claims that they would have rejected had they been aware of Defendants' illegal actions. Moreover, as a result of Defendants' illegal billing practices, reimbursement costs to the Federal government increased.

7. Relator Rieman became aware of the False Claims Act violations and other illegal practices described in this Complaint from her own direct observations while working for Akron Children's Hospital as a Pediatric Neuropsychologist.

## I. JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confer jurisdiction on this Court over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

9. This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because acts prohibited by 31 U.S.C. § 3729 occurred in this state and this judicial

3

district, primarily in Summit County, Ohio. Venue is proper in this district pursuant to 31 U.S.C.

§ 3732(a) because one or more acts proscribed by 31 U.S.C. § 3729 occurred in this district,

including, but not limited to, fraudulent billing for Medicaid-funded services at Akron Children's

Hospital Services in Akron, Ohio.

      10.     This Court has jurisdiction over Plaintiff's False Claims Act and Title VII claims

by virtue of the federal question and/or commerce provisions of the Judiciary Code, 28 U.S.C.

§§1331 and/or 1337. This Court has pendent jurisdiction over Plaintiff's state law claims.

      11.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint is filed under seal and

will remain under seal for a period of at least 60 days from its filing date or such other date as is

required by law or the Court so orders, and shall not be served upon Defendants unless the Court

so orders.

      12.     This suit is not based upon prior public disclosure of allegations or transactions in

a criminal, civil, or administrative hearing, lawsuit or investigation, in a Government

Accountability Office or Auditor General's report, hearing, audit, or investigation, from the news

media, or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. §

3730(e)(4)(A), amended by the Patient Protection and Affordable Care Act, Pub. L. No.

111-148, § 1313(j)(2), 124 Stat. 901-902 (2010).

      13.     To the extent that there has been a public disclosure of the information upon

which the allegations of this Complaint are based, Relator is an original source of this

information as defined in 31 U.S.C. § 3730(e)(4)(B), amended by the Patient Protection and

Affordable Care Act, Pub. L. No. 111-148, § 1313(j)(2), 124 Stat. 901-902 (2010). Relator

possesses direct and independent knowledge of the information as a result of an extensive

4

independent investigation she personally conducted into Defendants' wrongdoing, which she acquired in the course of her employment with Defendant Akron Children's Hospital and thereafter. Relator voluntarily and affirmatively disclosed the allegations herein to the United States Department of Justice United States' Attorney's Office in Akron and Cleveland, Ohio, and to the Attorney General of the State of Ohio, including prior to filing this Complaint. See 31 U.S.C. § 3730(e)(4).

## II.    PARTIES

14.    At all relevant times, Plaintiff-Relator Wanda Rieman, PhD is and was a female resident of Akron, Ohio. Dr. Rieman is a Clinical Psychologist, licensed to practice and in good standing in the State of Ohio.  In her employment, Dr. Rieman was responsible primarily for the clinical evaluation of pediatric subjects with possible neuropsychological symptoms or conditions. At all relevant times, Plaintiff performed her job fully and met all of her employers' legitimate performance expectations.

15.    Since on or about October 10, 2011, Dr. Rieman was employed by Defendant Akron Children's Hospital as a Neuropsychologist, in the Department of Psychiatry and Psychology and housed in the NeuroDevelopmental Science Center ("NDSC"). Her employment is expected to end on or about March 27, 2013.

16.    Defendant Children's Hospital Medical Center of Akron, doing business under the registered trade name of Akron Children's Hospital, is a not-for-profit corporation, operating a hospital primarily involved in providing pediatric medical care, in Akron, Ohio.

17.    Defendant Akron Children's Hospital is a trade name for the Children's Hospital Medical Center of Akron ("ACH").  Akron Children's Hospital is a nonprofit hospital and is the

5

largest pediatric healthcare system in northeast Ohio, operating two pediatric hospitals, 20 pediatrician offices, and about 70 pediatric specialty locations across the region. It is also a major teaching facility.

18.     Defendant Dr. Lisa Stanford is a licensed psychologist who specializes in neuropsychology and Director of the Akron Children's Hospital's Division of Neurobehavioral Health and Clinical Training Director of the Pediatric Neuropsychology Fellowship Program. Dr. Stanford started working at Akron Children's Hospital in July 2011. She began seeing patients at Akron Children's Hospital in October 2011. Dr. Stanford was hired to run the Division of Neurobehavioral Health, whose function is to perform neuropsychological examinations of children with suspected or known neurological and/or psychiatric conditions and evaluate and treat children with psychological conditions related to neurological issues.  Defendant Stanford resides in Akron, Ohio.

19.     Defendant Lisa Stanford was Dr. Rieman's immediate supervisor in the Akron Children's Hosptial's Department of Psychiatry and Psychology.  Dr. Stanford holds a PhD. in psychology and is licensed to practice psychology in the State of Ohio.

## III.   REGULATORY FRAMEWORK

### A.    Federal Government Health Programs

20.     The Federal and State governments, through government health programs such as Medicaid, Medicare, TRICARE, and government employee health benefit plans, are among the principal payors for medical services rendered by health care providers affiliated with Defendant Akron Children's Hospital.  The allegations in this complaint apply to all health care programs funded by the Federal government.

6

21.     Medicare is a Federal government program primarily benefitting the elderly and disabled that was created by Congress in 1965 when it adopted Title XVIII of the Social Security Act.  Medicare is administered by the Center for Medicare and Medicaid Services.  Medicare Part A covers medical care for patients admitted to the hospital, while Medicare Part B covers doctor's visits and medical care provided on an outpatient basis.

22.     Medicaid is a public assistance program that provides payment of medical expenses for low-income patients.  Congress created Medicaid at the same time it created Medicare in 1965 by adding Title XIX to the Social Security Act.  Funding for Medicaid in Ohio is shared between the Federal government and the Ohio State government.

23.     In accordance with 42 U.S.C. § 1396 and changes made to the Social Security Act in 2010 and Ohio law, Ohio Medicaid presumptively covers children for healthcare services, including neuropsychological services.

24.     Medicare and Medicaid are administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency which sets standards and regulations for participation in the programs.  The Ohio Department of Job and Family Services (ODJFS) administers Ohio's Medicaid program.

25.     TRICARE is the health care system of the United States military, designed to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel and military retirees and their dependents.  The program operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers.  TRICARE is a triple-option benefit program designed to give

7

beneficiaries a choice between health maintenance organizations, preferred provider
organizations, and fee-for-service benefits.

26.     The Medicare and Medicaid programs work by reimbursing health care providers
for the cost of services and ancillary items.  Medicare and Medicaid are supposed to reimburse
health care providers, such as Defendants, only for those services that were actually performed
and were medically necessary for the health of the patient and that were ordered specifically by a
physician, using appropriate medical judgment and acting in the best interest of the patient. The
Medicare and Medicaid administrators rely on direct and implied representations by providers,
reimbursable in whole or in part, that the services billed by the providers are medically necessary
for the patient, are actually performed as billed, and are compensable by law.  The other
government-funded programs described above operate in a similar fashion.

27.     Medicare, Medicaid, and other Government healthcare programs require that the
service had to be physically performed and billed accurately and according to CMS policies and
procedure codes.  CMS requires healthcare providers' certifications that they complied with all
laws and regulations governing the provision of health care services.  These certifications are an
absolute condition precedent to retaining the Medicare, Medicaid, and other federal funds
conditionally advanced by the United States and the State of Ohio and a prerequisite to continued
future participation in these health care programs.  Without such certification, Defendants are
required to repay all payments previously received.

28.     Under the Medicare and Medicaid programs, regional intermediaries set the
compensation rates for services by assigning a specific provider reimbursement payment amount
for all five digit billing codes, known as the Current Procedural Terminology code or the CPT

8

code. The CPT system and other similar coding systems identify with particularity the nature of the service performed. The other Government health care programs operate similarly. But for Defendants' certifications of compliance with these requirements, impliedly or otherwise, the United States and the State of Ohio would not reimburse Defendants for claimed services.

**B.      The False Claims Act**

29.      Originally enacted in 1863, the False Claims Act was substantially amended in 1986. The 1986 Amendments enhanced the government's ability to recover losses sustained as a result of fraud against the United States. The Act was again amended in 2009 and 2010, further strengthening the law.

30.      The False Claims Act provides that any person who knowingly presents or causes another to present a false or fraudulent claim to the government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the government. 31 U.S.C. § 3729(a)(1), (2). The False Claims Act empowers private persons who have information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery. The complaint must be filed under seal without service on any defendant. The complaint remains under seal while the government conducts an investigation of the allegations in the complaint and determines whether to join the action.

31.      Knowingly billing a Government health care program for services that were not provided as stated or services that are not covered by the program violates the False Claims Act.

9

## IV. SPECIFIC ALLEGATIONS OF DEFENDANTS' VIOLATIONS OF LAW

### A. Billing for Services Not Provided

#### 1. Background on Akron Children's Hospital's NeuroDevelopmental Science Center

32. Akron Children's Hospital's NeuroDevelopmental Science Center (NDSC) was formed in 2011 combining five pediatric specialties: developmental-behavioral pediatrics, neurology, neurosurgery, physiatry, and behavioral and neuropsychology.

33. Relator Dr. Rieman was employed in the Neurobehavioral Health Division of the NeuroDevelopmental Science Center (NDSC) as a Pediatric Neuropsychologist. Relator Dr. Rieman's main responsibility was to conduct neuropsychological examinations.

34. The purposes of a neuropsychological evaluation are to determine the pattern of brain-related strengths and weaknesses, to develop an understanding of the nature and origin of the patient's difficulties, to make a diagnosis, and to provide specific recommendations for appropriate intervention and treatment. Typically a neuropsychologist and a technician work together as the technician administers a battery of tests determined by the clinician and the neuropsychologist writes the report. The report is used by families in conjunction with teachers and medical and psychiatric providers to make intervention decisions.

35. Professionals who are trained to perform neuropsychological evaluations of children possess knowledge about normal development and cognition, normal and abnormal brain functioning, and the patterns of cognitive performance produced by various types of brain dysfunction.

10

36.     A child's neuropsychological evaluation is composed of (1) a clinical interview and observations of the child, (2) if possible, an interview of family members, (3) a review of relevant school and/or medical records, and (4) administration of a series of tests that measure domains of brain functioning that may include: attention, executive functioning, memory, language, visuospatial abilities, sensory-perceptual functioning, fine motor skills, academic performance, intellectual abilities, and behavioral/emotional functioning.

37.     In Dr. Rieman's experience, the process at Akron Children's Hospital for the neuropsychological evaluation of patients included many tests.  The testing utilized varied based upon information garnered from parents and others knowledgeable about the child and other factors, such as the child's age, cognitive abilities of the child, and health conditions or physical impairments.

38.     At Akron Children's Hospital, the typical length of testing for children under five years of age generally lasted three to four hours. There are more tests available to evaluate older children and they can tolerate a longer evaluation.  Therefore, evaluations of children older than five years of age were often eight to ten hours in length.

39.     All patients were scheduled to arrive at 8:00 A.M. on testing day to check in and sign consent to treatment forms. The neuropsychologist or technician would greet the family in the waiting room and walk with them to the neuropsychology area. An interview of the parent(s) and, depending on the age and ability to participate, the child, occurred first and often lasted between 45 to 60 minutes.  Children next accompanied the technician to the testing room and the technician administered tests. Breaks were given throughout the day as needed and a noon time break for lunch was scheduled. A pediatric patient's evaluation session typically includes testing,

11

interpretation, and report writing by a psychologist or physician, other healthcare professional, and computer.

40.    Upon completion of the tests, the neuropsychologist at Akron Children's Hospital and at most other institutions writes a detailed report that includes an overview of the initial interview, the results of the tests, and recommendations for treatment and rehabilitation.  As a result, this battery of tests, the observations by the neuropsychologist, and the subsequent report, serve as an important tool for psychologists and physicians in the treatment of neurological, medical, and psychiatric conditions.

41.    Relator Dr. Rieman estimates that approximately half the children evaluated and tested at the Akron Children's Hospital NeuroDevelopmental Science Center are paid by governmental payors, mostly Ohio Medicaid.  Because Dr. Rieman and Dr. Stanford evaluated and tested a total of approximately ten children every week, approximately five of the children they evaluated were Medicaid beneficiaries.

42.    The CPT billing codes for neuropsychological evaluations are used for hourly billing and vary depending on the type of examination and the person performing the examination.  See Ohio Medicaid Reimbursement eManual, p. 1-2, 215. The applicable codes are:

    96116  neurobehavioral status exam per hour, both face-to-face time and
           interpreting results and preparing the report

    96118  neurobehavioral testing per hour of physician or psychologist's time
           including administering and interpreting the tests and preparing the report

    96119  neuropsychological testing, per hour, performed by a qualified health care
           professional other than psychologist or physician

     96120  neuropsychological testing, per hour, administered by a computer with interpretation and report by a qualified health professional other than psychologist or physician

     96125  standardized cognitive performance testing, per hour, by a qualified health care professional other than psychologist or physician

These codes are used once for every hour of evaluation, with an hour meaning 31 or more minutes. For example, when a neuropsychologist spends between 31 minutes and 90 minutes with a patient, a code may only be billed once; if the time spent with a patient is between 91 and 150 minutes, a code may be billed twice.

### 2. Billing Fraud Regarding Feedback Interviews and Teacher Interviews

43. Defendant Dr. Stanford directed Dr. Rieman to bill for one hour of teacher interviews (CPT Code 96118) and one hour of parent follow up (CPT Code 96118), prior to actually performing those tasks. These tasks would be billed at the same time as the neuropsychological testing was billed, even though most often those tasks had not yet occurred. Often these tasks were never performed. Even when these tasks were performed, they usually took much less time than one hour. For instance, teacher interviews rarely last more than fifteen minutes.

44. It is Relator Dr. Rieman's belief that Dr. Stanford's bills also include billing for teacher interviews and parent follow ups that were not performed.

45. Relator Dr. Rieman estimates that only one quarter to one half of the teacher interviews and parent feedback interviews billed to government payors were actually performed. Moreover, even as to those that were performed, many of the teacher interviews were conducted

13

by the Hospital's technicians, not the psychologists, but were falsely billed at the higher rate for psychologists.

### 3.  Falsification of Time Records Originally Recorded on Hospital Billing Sheets

46.     On a routine basis, Dr. Stanford physically altered time records and billing sheets of Dr. Rieman to add one hour to her recorded testing time.  Dr. Stanford's alteration of Dr. Rieman's records can be seen on the face of the records, by comparing the very different handwriting of the entire form and the alteration by Dr. Stanford.

47.     In October 2012, Dr. Rieman was informed by Nikki Doulilis, an Akron Children's Hospital billing employee within the NeuroDevelopmental Science Center, that Dr. Stanford had altered Dr. Rieman's billing records to add one additional hour of billing for patients whom Dr. Rieman had tested and evaluated.

48.     Dr. Stanford's method to alter and falsify Dr. Rieman's records was to change the patients' arrival and departure times, typically adding about 30 minutes at the beginning of the day and another 30 minutes at the end of the day.  It is impossible to "double bill" for both the parent interview and the testing, because these occur simultaneously. Thus, Dr. Stanford changed Dr. Rieman's billing records to falsely reflect that these services were provided separately and at different times.

49.     Dr. Stanford overbilled payors by one hour using this same scheme for her own patients.

### B.    Billing for Medically Unnecessary or Unjustified Tests and Procedures

50.     Dr. Stanford directed Dr. Rieman to falsely diagnose children with medical/neurobiological conditions in order to satisfy Medicaid requirements for reimbursement,

14

rather than the appropriate psychiatric code, such as the unreimbursable"V" code. A typical psychiatric diagnostic code that Dr. Stanford directed was DSM-IV-TR 294.9,"cognitive disorder not otherwise specified." For example, in the neuropsychological field, a common description of certain evaluations of observed behavioral issues in children is that of "PRCP" or "Parent Child Relationship Problem." In these cases, an unreimbursable V Code should have been listed, rather than an Axis I or II DSM-IV-TR diagnostic code.  Dr. Stanford directed Dr. Rieman to report an inaccurate diagnosis so that Medicaid or other payors paid for the evaluation and services.

51.    Dr. Stanford directed that Dr. Rieman make an inaccurate diagnosis when, for example, children presented with issues that suggested a failure of parenting resulting in behavioral problems, but did not have a medical or psychiatric basis for their aberrant behavior. The clinical evaluation of "PCRP," under CMS and other guidelines, should result in billing a "V-code" diagnosis, indicating clinically significant behavioral or emotional symptoms in the child in which the target of therapeutic action is the relationship between parent and child.

52.    The effect of falsely diagnosing psychological illnesses in children is dramatic and raises serious patient care issues.  The sooner children get properly diagnosed the sooner appropriate interventions can occur, whether medical, educational, psychiatric, or parenting-related.  If there is no medical condition but one is falsely diagnosed, treatments and medications may be prescribed that are not necessary medically and do not assist the child. Interventions, such as medications, may be administered that are not needed. Children can be stigmatized and/or placed in special programs that do not benefit them and in fact cause them harm.  In addition, cash-strapped public schools could be forced to provide specialized assistance that may be unnecessary. The federal and state governments may provide Medicaid-funded

15

school-based or other services that are medically unnecessary. Early childhood misdiagnoses are particularly problematic considering the lifetime of potential problems and needed interventions. Deliberately altering a child's psychological diagnosis for the purpose of increasing the payment received can have serious consequences for the child, their families, and the community.

53.     Dr. Rieman believes that it is Dr. Stanford's practice to bill governmental programs for the wrong diagnosis to increase the Hospital's reimbursements. For the five to six examinations per week that Dr. Stanford performs and the additional four to five examinations that Dr. Rieman performed, Dr. Rieman estimates that one child per week is deliberately misdiagnosed with a more serious cognitive or psychiatric disorder than actually existed, for the sole purpose of increasing the Hospital's reimbursement from public and private payors.

54.     After this fraudulent diagnosis scheme was uncovered and disclosed by Dr. Rieman, an internal audit was conducted in November 2012 by Akron Children's Hospital's Coding/Compliance Manager. After reviewing Dr. Stanford's billing, the auditor found that there was not adequate evidence to support the coding that Dr. Stanford used. and, therefore, the claims submitted by Akron Children's Hospital.

55.     When Dr. Rieman started working at Akron Children's Hospital, Dr. Stanford directed Dr. Rieman to perform tests prior to receiving her hospital privileges and caused billings to be issued for such services, in violation of federal and state law.

56.     Defendant Dr. Stanford billed for testing when she was not on site. During the week of December 10, 2012, when she was on leave, Dr. Stanford billed providers under her billing code, even though she was not physically present and did not personally see or evaluate children or interview the families.

16

## C.    Billing by Unauthorized Personnel and Other False Billing

57.    For at least six months, from November 2011 to May 2012, Ohio licensure requirements regarding supervision of students at the NeuroDevelopmental Science Center were not followed.  As a result, Defendants caused billing and reimbursement from federal payors to occur in violation of Ohio, Medicaid, and Medicare requirements.

58.    Under Ohio Board of Psychology rules, a psychologist supervising more than four employees/students must submit a "more than four" form.  Dr. Stanford informed Dr. Rieman that she, as Director, would complete the necessary documentation but did not do so.  In May 2012, when Dr. Rieman advised the Ohio Board of Psychology Executive Director, that the Akron Children's Hospital NeuroDevelopmental Science Center was out of compliance, the Executive Director advised Dr. Stanford to timely register all supervisees with the Board and to file a "more than four" exception form for the affected supervisees.  He advised in writing and orally during a phone call that the non-compliance could have "led to an investigation of your supervisory relationships and your management of the processes which technically seemed to have allowed numerous supervisees to be delegated psychological work without the requisite registration with the Board."  He further stated that without Dr. Rieman's intervention, "I have a strong sense. . . that the supervisee registration would not have happened when it did."

59.    Dr. Stanford advised a surgery scheduler at the Akron Children's Hospital NeuroDevelopmental Science Center, to bill Medicaid as a primary payor, even though by law Medicaid is to be billed secondarily if commercial insurance is available.

60.    Dr. Rieman reported the fraud schemes above internally to Akron Children's Hospital throughout her tenure.  While some issues were rectified, many others were not.  The

17

Akron Children's Hospital NeuroDevelopmental Science Center Director and Administrative

Director knew of the fraud, but acted to conceal and minimize Dr. Stanford's fraud.

61.     As a direct result of disclosing the many irregularities at the NeuroDevelopmental

Science Center, Dr. Rieman's contract was not extended. She received a 180 day notice of

termination of employment on September 27, 2012.  On January 14, 2013 she was informed that

she did not have to report to work for the last several months of her contract.  Her employment

officially ends March 27, 2013.

**COUNT I**
**False Claims Act - Presentation of False Claims**
**31 U.S.C. §3729(a)(1), 31 U.S.C. § 3729(a)(1)(A) as amended in 2009**

62.     The allegations of the preceding paragraphs are re-alleged as if fully set forth

below.

63.     Through the acts described above, Defendants and their agents and employees

knowingly presented and caused to be presented to an officer or employee of the United States

Government a false and/or fraudulent claim for payment or approval in violation of 31 U.S.C. §

3729(a)(1), and, as amended 31 U.S.C. § 3729(a)(1)(A).

**COUNT II**
**False Claims Act - Making or Using False Record**
**or Statement to Cause Claim to Be Paid**
**31 U.S.C. §3729(a)(2), 31 U.S.C. § 3729(a)(1)(B) as amended in 2009**

64.     The allegations of the preceding paragraphs are re-alleged as if fully set forth

below.

65.     Through the acts described above and otherwise, Defendants and their agents and

employees knowingly made, used, and/or caused to be made or used false records and statements

18

in violation of 31 U. S. C. §§ 3729(a)(2), and, as amended 31 U.S.C. § 3729(a)(1)(B) in order to get such false and fraudulent claims paid and approved by the United States Government.

## COUNT III
### False Claims Act - Making or Using False Record or Statement
### to Conceal, Avoid and/or Decrease Obligation to Repay Money
### 31 U.S.C. §3729(a)(7), 31 U.S.C. § 3729(a)(1)(G) as amended in 2009

66.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

67.    Through the acts described above, in violation of 31 U.S.C. § 3729(a)(7) and as amended, 31 U.S.C. § 3729(a)(1)(G), Defendants and their agents and employees knowingly made, used, and caused to be made or used false records and statements to conceal, avoid, and/or decrease Defendants' obligation to repay money to the United States Government that Defendants illegally and fraudulently received or caused to be received. Defendants also failed to disclose material facts that would have resulted in substantial repayments to the United States.

## COUNT IV
### False Claims Act - Conspiracy
### 31 U.S.C. §3729(a)(3), 31 U.S.C. § 3729(a)(1)(C) as amended in 2009

68.    The allegations of the preceding paragraph are re-alleged as if fully set forth below.

69.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies to defraud the United States by getting false and fraudulent claims allowed or paid in violation of 31 U.S.C. § 3729(a)(3), and as amended 31 U.S.C. § 3729(a)(1)(C).  Defendants also conspired to omit disclosing or to actively conceal facts which, if

19

known, would have reduced Government obligations to it or resulted in repayments from it to Government programs.

70.     Defendants, their agents, and their employees, have taken substantial steps in furtherance of those conspiracies, inter alia, by preparing false records, by submitting claims for reimbursement to the Government for payment or approval, and by directing their agents and personnel not to disclose and/or to conceal their fraudulent practices.

71.     The United States, unaware of Defendants' conspiracy or the falsity of the records, statements, and claims made by Defendants, their agents, and employees, and a result thereof, has paid and continues to pay millions of dollars that it would not otherwise have paid. Furthermore, because of the false records, statements, claims, and omissions by Defendants and their agents and employees, the United States has not recovered federal funds from the Defendants that would have otherwise been recovered.

**COUNT V**
**False Claims Act Retaliation Violation**
**31 U.S.C. § 3730(h)**

72.     The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

73.     Relator Rieman took lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section and, as such, engaged in protected activity under the False Claims Act and other laws.

74.     Shortly after Plaintiff-Relator began working at Akron Children's Hospital, she noticed certain irregularities in Defendant Stanford's billing practices and directives, for services provided by Akron Children's Hospital's NeuroDevelopmental Science Center (NDSC).

20

75.     At all relevant times, on multiple occasions, Plaintiff questioned Defendant Stanford about these irregularities, but never received a satisfactory answer from Defendant Stanford.

76.     Specifically, at all relevant times, Plaintiff observed that Defendant Stanford engaged in and/or directed the apparent intentional misdiagnosis of patients in billing codes (apparently to assure insurance or Medicaid approval of payment for services), advance billing for follow-up appointments that had not yet occurred, and changing start and end times for appointments (to make them longer than they were), as well as changing billing codes on completed billing sheets.

77.     On about April 13, 2012, Plaintiff, concerned that the above described, observed billing practices by Defendant Stanford constituted possible criminal conduct and fraud, reported these irregularities and her concerns to Akron Children's Hospital's Human Resources personnel.

78.     Plaintiff repeatedly reported said concerns about Dr. Stanford's billing practices to Akron Children's Hospital management on multiple occasions.

79.     Defendants without good cause harassed, intimidated, and retaliated against Relator because of her objections to, and reporting of, Defendants' wrongdoing.  Defendants knew or should have known that Relator's activities investigating and opposing their unlawful conduct, including investigation for, testimony for, or assistance in an action filed under this section, were in connection with the False Claims Act action.

80.     Defendants retaliated against Relator for her lawful actions taken in furtherance of a False Claims Act action against Defendants, including, but not limited to, their investigation and assistance in an action alleging Defendants' violations of the False Claims Act and Relator's

21

efforts to prevent further False Claims Act violations by Defendants.  Relator reported, at various times, all of the above violations of law recited in this complaint to her superiors at Akron Children's Hospital prior to filing this action.

81.     Defendants have a duty under the False Claims Act, 31 U.S.C. § 3730(h) to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section and federal investigations.

82.     Defendants' misconduct and illegal treatment of Relator and those they derogatorily consider "whistleblowers" has the effect of stifling reports of violations of Federal law, including Medicaid and Medicare payment regulations.  This treatment effectively warned other employees that they should not engage in honest and open reporting of Defendants' conduct.

83.     The actions of Defendants damaged and continue to damage Relator in violation of 31 U.S.C. § 3730(h), in an amount to be determined at trial.

### COUNT VI
### Ohio Revised Code § 4113.52
### Whistleblower Retaliation

84.     The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

85.     Defendant Akron Children's Hospital is an employer within the meaning of Ohio Rev. Code  § 4113.52 (OhioWhistleblower Act). The Ohio Whistleblower Act prohibits employer retaliation against an employee who reports certain violations of law and threats to public health and safety, by the employer or a fellow employee.

86.      Plaintiff Rieman's internal reports to Akron Children's Hospital about Dr. Stanford's billing practices, constituted activity protected under Ohio Rev. Code § 4113.52.

87.      Fraudulent billing of an insurance provider or Medicaid constitutes a felony.

88.      Plaintiff reported said suspected billing fraud to the Ohio Board of Psychology on about May 14, 2012.

89.      Said report to the Ohio Board of Psychology constituted activity protected under Ohio Rev. Code § 4113.52.

90.      Plaintiff reported said suspected billing fraud to the Ohio Attorney General's Office, Medicaid Fraud division, on October 11, 12, 2012, and on other dates thereafter.

91.      Dr. Rieman's report to the Ohio Attorney General's Office constituted activity protected under Ohio Revised Code § 4113.52.

92.      In about May 2012, Plaintiff was instructed by Dr. Stanford to co-sign, with Dr. Stanford, an Ohio Board of Psychology "verification form," stating that Plaintiff was co-supervising neuropsychology supervisees, with Dr. Stanford, in the NDSC.

93.      Plaintiff declined to sign the form because of her concerns about Dr. Stanford's aforementioned abusive workplace conduct and concerns about the legal and ethical requirements of Plaintiff's professional licensure.

94.      Plaintiff communicated to management her concerns about potential legal or ethical violations arising from the co-supervision arrangement Dr. Stanford proposed, to no avail.

95.      Plaintiff's communication of her concerns and internal reports to ACH about the co-supervision arrangement and verification form issue constituted activity protected under Ohio Revised Code § 4113.52.

23

96.     Plaintiff was subsequently told that she would be fired if she did not sign the intern supervision verification form.

97.     On about May 10, 2012, Plaintiff conferred with the Ohio Board of Psychology to report the above-described supervision verification issue and to receive guidance on how to proceed.

98.     Dr. Rieman's May 10, 2012 report to the Ohio Board of Psychology constituted activity protected under Ohio Revised Code § 4113.52.

99.     Subsequently, Plaintiff, Dr. Stanford, and Dr. Stanford's superior, Dr. Constantinou, were all advised by informal Ohio Board of Psychology opinion that Plaintiff's concerns and reluctance to sign off on the proposed co-supervision of technical employees were valid and legitimate.

100.    The foregoing report and complaints to management, to the Ohio Board of Psychology, and the Ohio Attorney General's Office constituted "whistleblower" activity that is protected from acts of retaliation, under Ohio Revised Code § 4113.52.

101.    Plaintiff's above-described disparate and adverse treatment in the terms and conditions of employment, including her September 27, 2012 firing, was motivated by her engagement in protected whistleblower activity, as described above.

102.    By reason of the foregoing acts and omissions of retaliation in violation of Ohio Revised Code §  4113.52, by Defendant Akron Children's Hospital, Plaintiff has been damaged and is entitled to compensatory and injunctive relief, as well as punitive damages.

## COUNT VII
### Title VII, 42 U.S.C. §§2000e, *et seq.*
### Sex Discrimination and Retaliation

103.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

104.    At all relevant times defendant corporate employer Akron Children's Hospital is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e, *et seq.*, acting in relation to plaintiff in employment matters.

105.    Title VII prohibits, *inter alia*, sex discrimination in the terms and conditions of employment, as well as retaliation for opposing such treatment.

106.    Defendant Akron Children's Hospital is an employer within the meaning of the Ohio Civil Rights Act, Chapter 4112 of the Ohio Revised Code, and, specifically, Ohio Revised Code § 4112.01(A)(2).

107.    Plaintiff was supervised in employment in a chain-of-command by the individual female Defendant Lisa Stanford, PhD, also employed by Defendant Akron Children's Hospital and acting in the interest of the employer, directly or indirectly; and the definition of an employer in Ohio Rev. Code § 4112.01(A)(2) also applies to the supervisory Defendant.

108.    The Ohio Civil Rights Act prohibits, inter alia, sex discrimination in the terms and conditions of employment, as well as retaliation for opposing such treatment.

109.    Plaintiff Rieman plaintiff timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging employment discrimination on the basis of sex and retaliation, which Charge is hereby fully incorporated by reference, with a true copy attached.

25

110.    Plaintiff will seasonably supplement this Complaint by appending her EEOC "Right to Sue" letter, immediately upon her receipt of same.

111.    Plaintiff has satisfied all administrative prerequisites to bring the instant action under Title VII; and her remaining employment claims do not entail satisfaction of administrative prerequisites to filing this Complaint.

112.    Shortly after Plaintiff's Akron Children's Hospital employment began in October 2011, Defendant Stanford began subjecting Plaintiff to objectively offensive, hostile and abusive workplace treatment, including inappropriate, intimidating and unwarranted yelling, lewd and sexual remarks and false and insulting comments to and about Plaintiff.

113.    At all relevant times, Plaintiff calmly and professionally rebuffed and rejected defendant Dr. Stanford's offensive, unwelcome and sexual workplace behavior, but Dr. Stanford's highly objectionable behavior continued.

114.    On or about March 2, 2012, Plaintiff reported Dr. Stanford's offensive behavior and treatment to Dr. Stanford's supervisor, the head of Psychology, Georgette Constantinou, PhD.

115.    On or about March 28, 2012, Plaintiff again reported Defendant Stanford's offensive workplace conduct to Dr. Constantinou, including Dr. Stanford's unwelcomed and outrageous sexual conduct and comments and abuse.

116.    When Plaintiff's repeated complaints to Department head Dr. Constantinou failed to stop Defendant Stanford's ongoing workplace abuse, Plaintiff reported her concerns to Akron Children's Hospital Human Resources representative, Annette Provens, in about April 2012.

26

117.     Plaintiff's complaints about Dr. Stanford, to Dr. Constantinou and to Akron Children's Hospital Human Resources constituted protected activity within the meaning of both Title VII and the Ohio Civil Rights Act, which statutes both prohibit retaliation for engagement in such activity.

118.     At all relevant times, Dr. Stanford's treatment of Plaintiff was objectively offensive, severe and pervasive, created a hostile work environment, and unreasonably interfered with Plaintiff's ability to perform her job.

119.     At all relevant times,  Akron Children's Hospital failed or refused to take prompt, appropriate action to stop, prevent or correct Dr. Stanford's abusive treatment of Plaintiff.

120.     At all relevant times, Defendants knew, or should have known, that Dr. Stanford was engaging in illegal sex based harassment and discrimination in the Akron Children's Hospital workplace.

121.     At all relevant times, Dr. Stanford was an  Akron Children's Hospital manager and/or supervisor; and, as such, Dr. Stanford was an agent of Akron Children's Hospital.

122.     During the period March 2012 through May 2012, Dr. Stanford was made aware of Plaintiff's complaints about Dr. Stanford's offensive workplace conduct, by  Akron Children's Hospital management.

123.     Following Plaintiff's April 2012 complaint to Akron Children's Hospital Human Resources, and continuing thereafter, Dr. Stanford subjected Plaintiff to retaliatory adverse employment action, to wit: treating Plaintiff differently and worse than other employees; creating, perpetuating and failing or refusing to adjust an unmanageable workload for Plaintiff; and ostracizing Plaintiff.

27

124.    On about September 27, 2012, Plaintiff received written notification that her Akron Children's Hospital employment was being terminated.

125.    Said termination of employment, as well as the above described acts and omissions by Akron Children's Hospital and its agents constituted sex discrimination and/or retaliation in violation of Title VII, and all contrary assertions or reasons are a pretext for illegal discrimination or retaliation.

126.    By reason of the foregoing acts and omissions of gender discrimination and/or retaliation in violation of Title VII, by Defendant Akron Children's Hospital, Plaintiff has been damaged and is entitled to compensatory and injunctive relief, as well as punitive damages.

## COUNT VIII
### Ohio Civil Rights Act, Ohio Revised Code § 4112.01 *et seq.*
### Sex Discrimination and/or Retaliation

127.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

128.    The Ohio Civil Rights Act is substantially equivalent in all material respects and provisions, to federal Title VII.

129.    The Ohio Civil Rights Act provides for individual supervisor liability, where said individual supervisory employee, Defendant Stanford, acts directly or indirectly in the interests of an employer, Akron Children's Hospital.

130.    Defendant Stanford's above-described acts of subjecting Plaintiff to unwelcomed, offensive, severe and pervasive sex-based harassment and abuse constituted illegal sex discrimination, in violation of the Ohio Civil Rights Act.

28

131.    Defendant Stanford's above-described acts of subjecting Plaintiff to, *inter alia,* an unmanageable workload, disparate adverse treatment, and threatened firing and ostracism, following Plaintiff's complaints to management about Dr. Stanford's treatment of Plaintiff, constituted illegal retaliation, in violation of the Ohio Civil Rights Act.

132.    Defendant Akron Children's Hospital knew or should have known of its agent/management employee Stanford's illegal treatment of Plaintiff, and Akron Children's Hospital's failure or refusal to prevent or correct said treatment, along with its termination of Plaintiff's employment, constituted sex discrimination and/or retaliation, in violation of the Ohio Civil Rights Act.

133.    By reason of the foregoing acts and omissions of gender discrimination and/or retaliation in violation of the Ohio Civil Rights Act, by Defendant Akron Children's Hospital and individual Defendant Stanford, Plaintiff has been damaged and is entitled to recover from defendants, jointly and severally, sums of back pay, front pay, and compensatory and punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Relator requests that judgment be entered against the Defendants, ordering that:

1.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*;

2.    Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of the Defendants' actions;

3.  Relator be awarded the maximum "relators' share" allowed pursuant to 31 U.S.C. § 3730(d);

4.  Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

5.  Relator be provided with injunctive or equitable relief, as may be appropriate, to prevent further harm to herself and to prevent the harm to others and the public caused by Defendants' retaliation against whistleblowers;

6.  Relator be awarded all litigation costs, expert fees, and reasonable attorneys' fees incurred as provided pursuant to 31 U.S.C. § 3730(h) and state law;

7.  Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

8.  Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

9.  Relator be awarded all other damages to which she is entitled, including compensatory and punitive damages; and

10. Judgment against Defendant Akron Children's Hospital, as to all Counts, for equitable relief and redress, including declaratory judgments and preliminary and permanent injunctive relief, both prohibitory and mandatory;

11. Judgment against Defendant Lisa Stanford, as to those Counts pertaining to her, for equitable relief and redress, including declaratory judgments and preliminary and permanent injunctive relief, both prohibitory and mandatory;

12.     Judgment for Plaintiff and against Defendant Akron Children's Hospital as to all

        Counts of this Complaint and jointly and severally against Defendants Akron

        Children's Hospital and Lisa Stanford for back and front pay, plus prejudgment

        interests and costs, compensatory and punitive damages, as well as reasonable

        attorneys' and expert witness' fees and expenses under applicable law; and

13.     That the United States and Relator recover such other relief as the Court deems

        just and proper;

                                    Respectfully submitted,


                                    Ann Lugbill (0023632)
                                    Trial Attorney for Relator
                                    Murphy Anderson PLLC
                                    2406 Auburn Avenue
                                    Cincinnati, OH  45219
                                    Phone: (513) 784-1280
                                    Fax: (877) 784-1449
                                    *alugbill@murphypllc.com*

                                    Mark Hanna
                                    Lorrie Bradley
                                    Murphy Anderson PLLC
                                    1701 K Street NW, Suite 210
                                    Washington, DC 20006
                                    Phone: (202) 223-2620
                                    Fax: (202) 223-8651
                                    *mhanna@murphypllc.com*
                                    *lbradley@murphypllc.com*

                                    Nancy Holland Myers (0037964)
                                    697 West Market Street
                                    Akron, Ohio 44302
                                    Phone: (330) 414-1822
                                    *hmmlawnhm@neo.rr.com*

                                    **Attorneys for Relator Rieman**

                                    31

**RELATOR HEREBY DEMANDS A TRIAL BY JURY.**

_____
Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on this 22d day of March, 2013, a copy of the foregoing Complaint was served upon the following individuals as indicated below.

_____
Attorney

**Via Certified Mail/Return Receipt Requested:**

Honorable Eric H. Holder, Jr.
United States Attorney General
Attn: Daniel R. Anderson
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
Phone: 202-514-4504

Steven M. Dettelbach
United States Attorney
Northern District of Ohio
Attn: Kent Penhallurick
United States Courthouse
801 West Superior Avenue, Suite 400
Cleveland, OH 44113

**Via Regular Mail:**

Ann Lugbill (0023632)
Trial Attorney for Relator
Murphy Anderson PLLC
2406 Auburn Avenue
Cincinnati, OH 45219
Phone: (513) 784-1280
Fax: (877) 784-1449
*alugbill@murphypllc.com*

Mark Hanna
Lorrie Bradley
Murphy Anderson PLLC
1701 K Street NW, Suite 210
Washington, DC 20006
Phone: (202) 223-2620
Fax: (202) 223-8651
*mhanna@murphypllc.com*
*lbradley@murphypllc.com*

Nancy Holland Myers (0037964)
697 West Market Street
Akron, Ohio 44302
Phone: (330) 414-1822
*hmmlawnhm@neo.rr.com*

Kent Penhallurick
Assistant U.S. Attorney
Northern District of Ohio
United States Courthouse
801 West Superior Avenue, Suite 400
Cleveland, OH 44113

James L. Bickett
Assistant U.S. Attorney
Northern District of Ohio
U.S. Attorney's Office
2 South Main Street
Akron, OH 44308